Filed 9/8/16  P. v. Upshaw CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B261323 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA353544) |
| v. | |
| ANDRE UPSHAW, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Monica Bachner, Judge.  Affirmed as modified.

David Polsky, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Susan Sullivan Pithey and Michael J. Wise, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Andre Upshaw appeals from a judgment and sentence following his convictions for murder, attempted murder, and shooting from a motor vehicle. He contends his trial counsel rendered ineffective assistance by failing to present exculpatory evidence regarding his truck, his race, and a witness's vantage point during trial, and claims the trial court should have granted his motion for new trial on those grounds. Defendant further argues the trial court erred in imposing a parole revocation fine, because he was sentenced to life without the possibility of parole.

We reject defendant's claims of ineffective assistance of counsel. Counsel's performance was not deficient. Even if it were, the record does not support defendant's contention that he was prejudiced by counsel's alleged errors.

Respondent agrees with defendant's contention that the parole revocation restitution fine must be stricken. We accordingly affirm the convictions and modify the abstract of judgment to delete the parole revocation restitution fine. As modified, the judgment is affirmed.

**PROCEDURAL HISTORY**

Defendant was charged by amended information with the attempted premeditated murder of William Vargas (Pen. Code, §§ 667/187, subd. (a))[1], the murders of Eric Zamarripa and Carlos Gonzalez (§ 187, subd. (a)), and shooting from a motor vehicle in connection with the Zamarripa murder (§ 12034, subd. (c)). The amended information alleged that defendant personally and intentionally discharged a firearm during all four crimes, causing great bodily injury and/or death to his victims (§§ 12022.53, subds. (b), (c), & (d)),[2] and that he committed all four crimes for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)). The information further alleged as special circumstances that defendant committed more than one murder (§ 190.2, subd. (a)(3)) and that he committed

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.
[2] At trial, the prosecution abandoned the allegations under section 12022.53, subdivisions (b) and (c) and asked the jury to make findings only as to section 12022.53, subdivision (d).

2

those murders to further the interests of a criminal street gang in which he was an active participant (§ 190.2, subd. (a)(22)).

A jury found defendant guilty as charged and found true all of the enhancement and special circumstance allegations. Defendant moved for new trial on several grounds, including ineffective assistance of counsel. After holding a lengthy hearing, the trial court denied the motion.

The court sentenced defendant to a total of two terms of life without parole, plus an additional 90 years to life, for the two murder counts, the attempted murder, and the enhancements related to those counts. It imposed and stayed (§ 654) an additional term of 30 years to life for shooting from a motor vehicle and the related enhancements. The court also imposed various fines and fees, including a parole revocation restitution fine of $10,000.

Defendant timely appealed.

## FACTUAL BACKGROUND[3]

### I.    Prosecution Case

#### A.    Vargas Shooting on Echo Park Avenue

Victim William Vargas testified to the following. On Sunday, March 1, 2009, he was drinking and socializing with seven or eight friends outside a home on Echo Park Avenue in Los Angeles. Vargas, who went by the nickname "Memo," was a member of the Echo Park gang who had been friends with defendant in the past. Vargas had done "a lot of dirt with" defendant, "a lot of gang bangs," and therefore knew defendant's "capabilities." Vargas apprised one of his friends at the gathering, Eric Zamarripa, of defendant's "capabilities," and warned Zamarripa that defendant had been "coming

---

[3] In its brief, respondent notes that "where appropriate," it "has relied on portions of appellant's Statements [sic] of Facts for ease of reference." Respondent's statement of facts is virtually identical to that prepared by defendant. Such wholesale "reliance," including the duplication of minor citation errors, is of no value to the court and is not "appropriate."

3

around." Zamarripa left the gathering and returned to his own home around the corner before defendant "came up" at around 5:00 p.m.

When defendant arrived, Vargas and his friends "walked out as a crowd" to meet him. Vargas realized that defendant "had his gun out" and asked him, "What are you going to do with that? Are you going to fucking use that?" In response, defendant "used it real quick and fast" to shoot at Vargas. Vargas ducked behind a pole, but not before sustaining a gunshot to his left arm. One of Vargas's friends fired back at defendant, "but his shit jammed." Defendant got into his truck and drove around the corner.

Michael Alvarez testified that he was driving south on Echo Park Avenue at around 5:00 p.m. on March 1, 2009. His window was open and it was sunny outside. Near the intersection of Echo Park Avenue and Baxter Street, Alvarez saw Vargas and his group of friends on the right side of the street and defendant on the left. Defendant, whom Alvarez described as "Latin in nature" and identified in court, was wearing a black tank top. Defendant seemed to be arguing with someone in the group. Alvarez saw defendant retrieve what appeared to be a nine-millimeter gun from a nearby "late 70's maybe early 80's" brown vehicle. Alvarez then saw defendant cross the street in front of Alvarez's car, put the gun to the head of the man with whom he was arguing, and say something to the effect of, "Do you think I'm fucking with you?" The man defendant confronted put his hands to his face in a defensive posture and backed away. Alvarez drove past the men and lost sight of them as he rounded a bend. He heard gunshots approximately 20 seconds later.

Anselm Clinard testified that he was driving north on Echo Park Avenue at around 5:00 p.m. on March 1, 2009. He saw a Hispanic man wearing a dark-colored sleeveless shirt standing next to a black Dodge truck with silver racing stripes. The man in the sleeveless shirt drew a gun and fired it several times at two men across the street as he got into the truck. The men who were shot at "scrambled" behind a parked vehicle. The shooter drove north on Echo Park Avenue and turned left onto Baxter Street. Clinard called 911 and reported the incident.

4

Los Angeles Police Department (LAPD) detective Harold DiCroce recovered seven .38-caliber bullet casings from Echo Park Avenue. He also recovered a single .45-caliber bullet casing immediately next to Vargas, who was sitting on the street bleeding. An LAPD criminalist testified that all of the .38-caliber casings were fired from the same gun, and the .45-caliber casing was fired from a different gun. A second criminalist testified that she later examined a black Dodge truck with two silver stripes and found what appeared to be a bullet hole in the driver's side door.

### B.     Zamarripa Shooting on Baxter Street

Zamarripa's girlfriend, Leticia Ayon, testified that she lived with Zamarripa on Baxter Street. According to the prosecution's gang expert, Zamarripa was the "right-hand man" of Carlos Gonzalez, a "tax collector" for the Mexican Mafia who also belonged to the Echo Park gang. He was also friends with Vargas, and attended the gathering on Echo Park Avenue with Vargas on March 1, 2009.

When Zamarripa returned home at around 4:30 p.m., he went outside to listen to music and work on a car. Ayon, who was cooking in the kitchen, could hear his music and see him from the window. At around 5:00 p.m., Ayon heard about four gunshots. She saw Zamarripa leave the backyard and walk toward the front of the house. Ayon similarly left the kitchen and began walking through the hallway to the front of the house.

While Ayon was on her way to the front of the house, she heard the front gate open. She then heard two more gunshots. After pausing for a few seconds, she walked to the front door and looked outside. She saw Zamarripa running back toward the gate holding his chest. Ayon ran back through the house and out the back door. By the time she reached Zamarripa, he had fallen to the ground. She saw blood coming from his chest and heard him gasping for air. Ayon tried to render aid and screamed for help. The wound proved fatal, however; a medical examiner testified that Zamarripa died as a result of a single gunshot that passed through his abdomen and chest.

Zamarripa's next-door neighbor, Miguel Chavez Franco, witnessed the shooting. Franco was taking a nap in his upstairs bedroom on March 1, 2009 when gunshots woke him around 5:00 p.m. Franco got up and looked outside. He saw and heard a black

5

Dodge truck with gray stripes making a left turn from Echo Park Avenue onto Baxter Street. The truck stopped in front of Zamarripa and Ayon's house. Franco, a native Spanish speaker, heard the driver of the truck say, in English, something to the effect of, "Eric, how about if you die today?" Franco saw the driver, who was wearing a black sleeveless shirt, extend his left hand out the window of the truck and point it toward Zamarripa. Franco then heard three shots and saw the truck drive west on Baxter. Franco, who saw the driver's face in profile, said that he looked "very similar" to defendant.

Helen Kanno testified that she lived up the street from Zamarripa and was friendly with him. On March 1, 2009, she was walking along Baxter Street at about 5:00 p.m. She had just walked past Zamarripa's house when she heard loud music and gunshots. She heard Zamarripa come out of the gate as she continued to walk. Kanno heard Zamarripa yell something, and then heard more gunshots. She turned around but did not see Zamarripa anymore. A pickup truck with two white or gray stripes drove past her.

LAPD detective DiCroce testified that he recovered two .38-caliber bullet casings outside of Zamarripa's residence. Both casings were from the same manufacturer as those found on Echo Park Avenue, and were fired from the same gun.

### C. Gonzalez Shooting on Toland Way

On March 1, 2009, then-eight-year-old Ariana A. lived in an apartment building on Toland Way with her mother, Celena Juarez, and her siblings Angel and Amber. Several members of Ariana's extended family also lived in the apartment building, including her grandmother's sister, Yolanda. Yolanda was the mother of defendant's girlfriend, Connie Cordero. Defendant and Cordero did not live in the Toland Way apartments, however; they lived in Pasadena with their children. Ariana had been to their house and knew defendant.

According to the prosecution's gang expert, many members of Ariana's extended family who lived at the Toland Way apartments were "well into the Avenues street gang and also into the Mexican Mafia," a prison gang "comprised mainly of Southern [California] Hispanic gang members." The Toland Way apartment building was in

6

Avenues territory and was about an eight-minute drive away from Zamarripa's house on Baxter Street. Ariana's father, Carlos Gonzalez, was a member of the Echo Park street gang, which was a rival of the Avenues. Nevertheless, he visited Ariana and her siblings at the Toland Way apartment building almost every weekend.

On March 1, 2009, Gonzalez was at the Toland Way apartment building visiting his children. Ariana testified that Gonzalez brought his dogs, and he was playing with her, Angel, and the dogs on the front lawn of the Toland Way apartment building. While they were outside, Ariana saw defendant pull into the apartment building's driveway in his black truck with stripes. He drove past them to the back parking lot without acknowledging them. At some point, he drove back down the driveway and left. Ariana, Angel, and Gonzalez remained on the front lawn with the dogs.

A couple of minutes later, defendant returned in his truck. Instead of driving to the parking lot, he parked his truck by a trash bin alongside the driveway. Defendant got out of the truck. He was wearing all black clothing and a black beanie, and he was holding a small black gun that Ariana testified "spins in the middle" and looked like a cap gun.

Defendant walked toward Gonzalez and Ariana and pointed the gun at Gonzalez. Defendant told Ariana and Angel to go inside. Angel "grab[bed]" Ariana, and they started running toward their apartment. While they were running, Ariana heard two shots. She turned around and looked back toward the front lawn. She saw defendant standing over Gonzalez, who was lying on the ground. Defendant got back into his truck and drove away. A medical examiner testified that Gonzalez sustained four gunshot wounds to his face and torso. Two of the shots were fatal; the medical examiner opined that "multiple gunshot wounds" were the cause of Gonzalez's death.

Then-13-year-old Pearlyn Nazareno testified that she was across the street from the Toland Way apartment building on March 1, 2009. She was washing her uncle's car with her uncle and brother. Nazareno, who attended school with Ariana's older sister Amber and was familiar with Ariana's family, saw Ariana and her siblings outside the Toland Way apartment building with Gonzalez.

7

At some point, Nazareno saw a "darkish" colored truck with racing stripes parked in the driveway of the Toland Way apartment building. She also saw a man speaking to Gonzalez. Nazareno described the man as "[l]ight skinned" and "Caucasian" or "Latino." He was wearing dark-colored clothing and had something on his head. Based on the man's "face in general," his "jaw shape," and his "light skinned" skin tone, she testified that he looked similar to defendant.

Nazareno and her family finished washing the car and went inside. Shortly thereafter, she heard gunshots. She looked out the window and saw Gonzalez lying on the ground. The man she had seen speaking to Gonzalez was walking to the truck parked in the driveway. Nazareno saw him stow a gun "in his back pocket or somewhere on him," and look back at Gonzalez a few times. He got in the truck and drove toward Avenue 45.

Jeffrey Aguilar testified that he was talking with a friend in his driveway on Toland Way around 5:30 p.m. on March 1, 2009. He heard five or six gunshots and looked down the street. "[S]oon after, a black Dodge Ram single cab with silver racing stripes came up and made a left on Avenue 45." The truck came from the direction of the gunshots. Aguilar testified that the truck was not traveling at an excessive rate of speed, but it ran several stop signs. The driver, who was the only person in the truck, "had olive skin and didn't appear to be white." He was wearing a black beanie.

### D. Gang Evidence

LAPD officer Elias Villasenor testified as a gang expert. Villasenor opined that defendant, Vargas, Zamarripa, and Gonzalez all belonged to the Echo Park street gang, a Latino gang based in northeastern Los Angeles.[4] The first two March 1, 2009 shootings—the shooting of Vargas on Echo Park Avenue and the shooting of Zamarripa on Baxter Street—occurred within territory claimed by the Echo Park gang. The third shooting, of Gonzalez on Toland Way, occurred within territory claimed by a rival of the Echo Park gang, the Avenues, another Latino gang.

---

[4] The prosecution's rebuttal witness, LAPD officer Kelly Edwards, also testified that defendant admitted in his presence that he belonged to the Echo Park gang.

Villasenor testified that it would be unusual for an ordinary member of the Echo Park gang to go into Avenues turf. However, it would not be uncommon for an Echo Park gang member who also had an affiliation with the Mexican Mafia to transverse the boundaries between rival Latino gangs. Villasenor explained that "[b]ecause they're a representative [of] the Mexican Mafia, they get that status, that respect status where they can go into any other rival gang, because they're working under the Mexican Mafia. They're not representing their own personal gang or neighborhood." A second gang expert, special agent John Castanedo of the California Department of Corrections and Rehabilitation, gave similar testimony.

According to Villasenor and Castanedo, the Mexican Mafia is a prison gang composed of members of Hispanic gangs in Southern California. Although the Mexican Mafia wields a substantial amount of power and influence, its membership is relatively small: Castanedo testified that there were only approximately 150 members in 2009, many of whom were serving lengthy prison sentences. According to Castanedo, the Mexican Mafia uses force, fear, and intimidation to get street gangs to "work at their behest."

The primary purpose of the Mexican Mafia is to make money for itself, its members, and its associates. According to Castanedo, "[m]oney flows into the Mexican Mafia in various ways," including the smuggling and sale of illicit goods in prisons, and "taxing" various activities that occur outside prisons. Both experts explained that "taxes" are a "type of extortion money payment" collected from street gangs who do business within Mexican Mafia territory. Individuals or gangs who fail to pay taxes face consequences ranging from the doubling of the tax all to murder.

Because most members of the Mexican Mafia are incarcerated, it relies on "soldiers" outside of prison to "do the dirty work" and "the day-to-day activity." Mexican Mafia soldiers, also known as associates or representatives, are recruited or appointed from gangs within Mexican Mafia territory. When an individual becomes a representative of the Mexican Mafia, he or she can be given the authority and responsibility to tax multiple gangs in multiple areas.

9

Both Villasenor and Castanedo opined that Toland Way shooting victim Gonzalez was an associate or representative of the Mexican Mafia. Villasenor testified that Celena Juarez, the mother of Gonzalez's children, had familial ties to the Mexican Mafia through her relatives, the Aguirres and Corderos. Castanedo based his conclusion on a letter Gonzalez wrote to a high-ranking Mexican Mafia member, Richard Aguirre, a relative of Juarez and defendant's girlfriend Connie Cordero; only certain people were permitted to communicate with high-ranking members.

In that letter, which Castanedo opined was written in coded language, Gonzalez informed Aguirre that "the company that he used to do work for was not happy with his services at this time" because "they found a discrepancy on their books, and that approximately $25,000 had not been accounted for." According to Castanedo, that language meant that the Mexican Mafia believed Gonzalez had not appropriately accounted for monies he collected on its behalf, and Gonzalez was "asking for guidance and help from Mr. Aguirre." Mexican Mafia representatives who fail to perform their assigned tasks could, like disobedient or noncompliant gangs, suffer consequences up to and including murder. The Mexican Mafia authorizes such punishment, which both experts explained is called putting a "green light" on someone. A green light can extend beyond the soldier to other members of his or her local gang. Villasenor opined that Gonzalez had fallen out of favor with the Mexican Mafia and was on a green light list, and Castanedo testified that the financial discrepancies described in Gonzalez's letter to Aguirre could result in a green light on both Gonzalez and members of his gang.

Villasenor and Castanedo both opined that defendant also was a Mexican Mafia representative who collected taxes for the organization. On two separate occasions in September and October 2008, police observed him and his distinctive truck in Avenues gang territory accompanied by a member of the Avenues gang. Such fraternization would be very risky for an ordinary member of the Echo Park gang but would be acceptable for a member working under the auspices of the Mexican Mafia. In addition, on the September occasion, defendant had $958 in cash and a .38-caliber revolver in his possession.

10

Both experts opined that all three March 1, 2009 shootings were committed at the direction or for the benefit of the Mexican Mafia. The prosecution also presented evidence that the Mexican Mafia had common signs or symbols, and that three predicate crimes, including murder and attempted murder, had been committed in recent years at its behest and for its benefit.

### E. Jail Calls

Defendant was arrested and taken into custody on March 2, 2009. One of the officers who spoke to defendant at that time estimated that he was about 6'2" or 6'3" and between 240 and 260 pounds. While defendant was incarcerated awaiting trial, he made several phone calls to his girlfriend, Cordero. Recordings of the calls were played for the jury.

In one of the calls, defendant asked Cordero, "did you ever take Ernie and get his haircut?" Cordero responded, "Yeah. That dude fucking changed his number and then fucking I went down there and he was like trying to doubt - - like doubt you." She continued, "And then that fool just shined on me like nothing." Defendant suggested that she "just give him Bubba's . . . address and tell him from now on, that's where it goes and that's it." Castanedo opined that the call did not in fact concern a haircut for a child. He believed defendant and Cordero were discussing the collection of taxes for the Mexican Mafia. According to Villasenor, "Bubba" was the moniker of Pete Cordero, Cordero's brother and Juarez's cousin, who belonged to the Echo Park street gang and the Mexican Mafia.

In another call, Cordero told defendant, "They're trying to make you look real bad because of the kids, you know." Defendant responded that "it says something in the report," that "somebody . . . said they seen the kids, what - - whatever walk down the driveway blah, blah." Later, he said, "I would have known," and continued, "supposedly that someone . . . fucking had eyes right there or something. But they said that the kids were gone, you know." He asked Cordero to "let your uncle and whoever know that it's got to be on her. You know what I mean? . . . [T]hey got to let him know that she gonna to try to [*sic*] twist me up." He later commented, "her brother could put her in her place."

11

According to Villasenor and Castanedo, the Mexican Mafia does not approve of engaging in shootings or other criminal activity around children; Castanedo testified that "[t]o murder somebody in the presence of children in the eyes of the Mexican Mafia is a big no no."

In a third phone call, defendant informed Cordero that he was "trying to get in touch with . . . Memo." In another, he asked her to get Memo's number for him and reiterated that he was "trying to locate Memo." Memo was the nickname of William Vargas, the victim of the Echo Park Avenue incident.

According to Villasenor, defendant also had phone conversations with Cordero's mother, Yolanda, while he was in jail. Villasenor testified that during one of those conversations, defendant and Yolanda discussed getting messages to Yolanda's brother, Richard Aguirre, at Pelican Bay State Prison. According to Villasenor, a Mexican Mafia member like Aguirre could "approve" or "bless" a killing committed by one of its associates. That is, as Castanedo testified, he could "bless" or "sanction" or "authorize the murder and say that no rules were broken and that it was okay." A person of Aguirre's status also could take a green light off of someone.

## II. Defense Case

### A. Defendant's Testimony

Defendant testified on his own behalf. Although he grew up in Avenues territory, "ran around" with some Echo Park members in his youth, and "interacted and partied with" members of both gangs, he was not and never had been a member of either gang. He was not a member of the Mexican Mafia either. Defendant denied that Echo Park and the Avenues were bitter rivals. He admitted to getting into "some trouble" in the past, but denied that violence was involved.

Defendant met Cordero around 1990, when he was in junior high school. He remained friendly with her over the years and eventually developed a relationship with her. Defendant got to know Cordero's family as well, and moved in with them in 1995 or 1996. At some point, he lived with Cordero's mother, Yolanda, on Toland Way. He was

12

aware that some of Cordero's family members were in prison and were alleged to be members of the Mexican Mafia, but he did not know whether the allegations were true.

Defendant and Cordero had a child together, and he raised Cordero's other two children, including a boy named Ernesto, as his own. Defendant, Cordero, and the children lived in defendant's grandmother's house in Pasadena. Defendant stayed at home to take care of one of the children, who was born with special needs.

Defendant owned a black truck with racing stripes. On March 1, 2009, he drove the truck to a house on Echo Park Avenue "to speak to an individual by the name of Felix." While he and Felix were talking on the driveway, a black truck drove past. Others who were present at the house made some comments to the effect of, "there goes that vehicle again." As the black truck turned and came back toward the house, the other individuals, including Vargas, exited the backyard. Some of them went into the street. The truck parked a little past the driveway.

The driver of the truck jumped out and started talking to Vargas, while the passenger remained in the vehicle. Defendant described the truck driver as bald, with a goatee and tattoos. Defendant estimated the driver's height to be between 5'10" and 6'0." Defendant did not recognize him. Defendant continued his conversation with Felix.

About 30 to 60 seconds later, defendant heard a gunshot. Defendant ducked as the driver and Vargas's group exchanged "a volley of shots." When he heard and saw the truck leave, defendant "immediately ran across the street," jumped in his truck, and attempted to follow the black truck. He saw the black truck turn onto Baxter.

As defendant was making the turn onto Baxter, he heard more gunshots. Defendant looked up Baxter and saw the truck driving quickly down the street. He turned his truck onto Baxter but lost sight of the black truck at the top of a hill.

Defendant "was kind of shook" and decided to leave the area. He drove to Yolanda's residence, the Toland Way apartment building. He knew Yolanda was not there, but thought her husband John would be home. While en route, at 5:14 p.m.,

13

defendant used his cell phone to call John. He did not call the police to report the shootings.

When defendant arrived at the Toland Way apartments, he drove all the way down the driveway and into the parking lot, looking for John's car. When he did not see it, he put his truck in reverse and backed down the driveway. He saw Gonzalez, Ariana, and Angel on the front lawn. Ariana waved at him as he left. Defendant learned that Gonzalez had been shot about five to 10 minutes after he arrived home in Pasadena.

Defendant did not know if Gonzalez collected taxes; he and Gonzalez did not interact much. Defendant had no problems with Gonzalez and would have had no reason to shoot him on March 1, 2009. Defendant knew Zamarripa "throughout the years from Echo Park." He did not have "any beef" with Zamarripa either.

Defendant testified that he had never been asked to join the Mexican Mafia, to put in work for the organization, or to shoot anyone on its behalf. Defendant also stated that he did not collect taxes for the Mexican Mafia. Neither Richard Aguirre nor anyone associated with him ever instructed defendant to engage in any type of violent activity. Defendant tried to contact Aguirre while defendant was in jail to inform Aguirre that he had no involvement in the March 1, 2009 shootings. Defendant was concerned for his own safety as well as that of his children, Cordero, and her family.

Defendant explained that he tried to contact Vargas from jail because he wanted Vargas to "[s]ay the truth" on his behalf in court. He did not discuss taxes with Cordero. They talked about a haircut for her son, Ernesto, because defendant "used to maintain his hair" and "wanted him to have a decent haircut." Defendant conceded that his comments about Bubba were in reference to Pete Cordero, and that those comments did not pertain to Ernesto's haircut.

## B.     Other Percipient Witnesses

Celena Juarez,[5] Ariana's mother, testified that on March 1, 2009, she was at home in her Toland Way apartment. Her children were on the front lawn with Gonzalez. At around 5:30 p.m., Celena went outside to call them in for dinner.

Celena gave somewhat inconsistent testimony about her location at the time she heard the gunshots. Celena initially testified that her children met her halfway down the driveway. After that, she ran to the front yard because she heard gunshots. Celena later stated, however, that she was in the house when she heard the gunshots. She admitted telling police that she met her children on her way to the front yard, but denied telling them that she was halfway there when she heard the gunshots. On cross-examination, she agreed that she was heading toward the front of the building when her children ran at her, hysterical.

Danielle Juarez lived at the Toland Way apartments on March 1, 2009. She saw defendant's truck arrive at the property twice that day. He parked his truck near Yolanda's unit. Danielle heard defendant leave once; his truck was loud. She left the property before defendant left the second time. As Danielle was leaving, she saw Gonzalez and his children on the front lawn. Danielle was not home when Gonzalez was shot; someone called her to tell her about the shooting about five minutes after she left.

Kendra Gratteri was driving along Toland Way on March 1, 2009. She saw children outside the Toland Way apartments. Gratteri then heard five gunshots. When she looked up, the children were gone. Gratteri saw both the shooter and the victim, however. Gratteri did not see the shooter's face, but described him as "a shorter man, probably around five eight or five nine; light-skinned brown man. Mexican American, if I had to guess. He was wearing black clothing, black denim jeans." After the shooter walked briskly to and left in a black truck, Gratteri got out of her car and attempted to administer CPR to the victim. While Gratteri was trying to help the victim, a woman

---

[5] We refer to Celena and her sister, Danielle Juarez, by their first names to avoid confusion.

15

who identified herself as the victim's ex-wife approached her and said or yelled, "Was it my cousin in a black truck? Was it my cousin in a black truck that did it?"

### C. Expert Witnesses

Dr. Mitchell Eisen, a psychologist, testified about memory and suggestibility, and their effects on eyewitnesses.

Anthony Paul, a retired police officer and firearms examiner, reviewed ballistics reports prepared by LAPD criminalists. He testified about various investigatory deficiencies in the reports. He also opined that the gun used in the Echo Park Avenue and Baxter Street incidents could have been a revolver.

Gregorio Estevane testified as a gang expert. He opined that defendant was not a member of the Echo Park gang. When presented with a hypothetical mirroring the facts of the case, Estevane opined that the shootings were not committed for the benefit of, in association with, or at the direction of the Mexican Mafia. In support of this opinion, Estevane testified that there was no evidence that the Mexican Mafia ordered the shootings and no evidence identifying the shootings as Mexican Mafia crimes, which would be necessary to benefit the gang.

Estevane further opined that the shooter was not associated with the Mexican Mafia because he acted alone; ordinarily, the Mexican Mafia sends three people to commit shootings. Additionally, one of the shootings occurred in the presence of children, and another was a "driveby," both of which are "completely contrary to what their code of conduct is." The Mexican Mafia could punish a shooter for violating that code. Estevane further opined that it "makes no logical sense" for someone who was assigned a task by the Mexican Mafia to subsequently attempt to contact alleged Mexican Mafia members to disclaim responsibility.

According to Estevane, the Mexican Mafia and other Latino gangs "do not want Blacks within their gangs, and they have shot and killed Blacks on sight." Thus, "it would be highly unlikely that there would be a benefit of a Black man to do Mexican Mafia business." Before forming any of his opinions, Estevane traveled to Pelican Bay State Prison and spoke to Richard Aguirre.

16

## DISCUSSION

### I.    Ineffective Assistance of Counsel

#### A.    Relevant Proceedings

After the jury rendered its verdicts, defendant fired his retained trial counsel. His new counsel later filed a motion for new trial in which he alleged that defendant's trial counsel rendered ineffective assistance. After exercising his right to represent himself, defendant supplemented the motion with an in propia persona filing alleging numerous additional instances of deficient performance by trial counsel.

The trial court held a lengthy hearing on the motion for new trial. With the aid of "advisory counsel" acting as his "professional friend," defendant elicited testimony from 14 witnesses, including his trial counsel. At the conclusion of the hearing, the trial court ruled that defendant had shown neither deficient performance nor prejudice resulting therefrom. The trial court accordingly denied defendant's motion.

#### B.    Legal Principles

Section 1181 enumerates nine grounds on which a motion for new trial may be granted. Although ineffective assistance of counsel is not among them, a new trial may be granted on nonstatutory grounds where failure to do so would result in a miscarriage of justice or denial of a fair trial. (*People v. Fosselman* (1983) 33 Cal.3d 572, 582; *People v. Whittington* (1977) 74 Cal.App.3d 806, 821, fn. 7.) Ineffective assistance by trial counsel is a recognized nonstatutory basis for seeking a new trial. (*People v. Fosselman*, *supra*, 33 Cal.3d at p. 582.) On appeal from the denial of a new trial motion based on a claim of ineffective assistance, we review the trial court's factual findings for substantial evidence and review de novo the ultimate issue of whether defendant's constitutional rights were violated. (*People v. Taylor* (1984) 162 Cal.App.3d 720, 724-725; cf. *People v. Uribe* (2011) 199 Cal.App.4th 836, 855-858.)

The Sixth Amendment to the federal constitution guarantees criminal defendants the right to effective assistance of counsel. (*Strickland v. Washington* (1984) 466 U.S. 668, 686 (*Strickland*); U.S. Const., 6th Amend.) The California Constitution affords

similar protection, and the analysis under the federal and state provisions is the same. (See *People v. Hung Thanh Mai* (2013) 57 Cal.4th 986, 1009 (*Mai*); Cal. Const., art. 1, § 15.) To demonstrate that he or she did not receive the effective assistance to which he or she is entitled, a defendant must make a two-part showing. "First, the defendant must show that the counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." (*Strickland*, *supra*, 466 U.S. at p. 687; see also *Mai*, *supra*, 57 Cal.4th at p. 1009.)

To show deficient performance, a defendant must demonstrate that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. (*Strickland*, *supra*, 466 U.S. at p. 688; *Mai*, *supra*, 57 Cal.4th at p. 1009.) Our evaluation of counsel's performance "must be highly deferential," and we "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." (*Strickland*, *supra*, 466 U.S. at p. 689.) We evaluate counsel's decision-making in the context of the facts available to him or her at the time (*id.* at p. 690), and we do not second-guess trial counsel's reasonable tactical decisions (*People v. Kelly* (1992) 1 Cal.4th 495, 520).

To show prejudice, the defendant must show "that there is a reasonable probability, but for counsel's unprofessional errors, that the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, *supra*, 466 U.S. at p. 694.) "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." (*Id.* at p. 693.) "A defendant must prove prejudice that is a '"demonstrable reality," not simply speculation.' [Citation.]" (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1241.)

18

**C. Analysis**

Defendant contends that his trial counsel performed deficiently by failing to elicit exculpatory testimony from defense witnesses Kendra Gratteri and Celena Juarez and by failing to introduce evidence of defendant's racial background. Defendant claims he was prejudiced by these errors because "the other evidence connecting [him] to the Gonzalez shooting was far from overwhelming," there "was not strong evidence that [he] was affiliated with the Mexican Mafia or that the shootings were Mexican Mafia related," and the missing evidence would have bolstered his case and undermined the prosecution's. We disagree. The record does not reflect a deficient performance by counsel. Even if it did, defendant has not shown that he was prejudiced by counsel's alleged errors.

**1. Performance**

**a. Gratteri Evidence**

During an interview with police, Gratteri described, in great detail, the truck she saw driving away from the Gonzalez murder on Toland Way. She stated that the truck was "super black," "all blacked out," and had black tinted windows and black wheels. It was "huge," "either an extended cab or some kind of dual cab situation," and was "souped-up," "very well washed and polished," and overall "very noticeable." Gratteri did not recall seeing damage on the truck. She "want[ed] to guess" it was a GMC, though she noted that its "bubbled wheels" could also be indicative of a Dodge Ram. The "most . . . visual thing" for Gratteri was "some kind of design on the tailgate," "white pinstripe graphics" and "swirly lines with straight lines." Gratteri drew the design for police. When shown a photograph of defendant's truck, Gratteri said it was not the one she had seen. She said, "I'll bet my life this is not the tailgate."

Defense counsel did not ask Gratteri about truck at trial. Instead, he focused his questioning on the shooter she saw. Gratteri testified that "He was a shorter man, probably around five eight or five nine; light-skinned brown man. Mexican American, if I had to guess. He was wearing black clothing, black denim jeans." Counsel confirmed with Gratteri that the perpetrator's height was "seared in [her] memory," and Gratteri testified that this description was the same one she gave the police. The description

19

Gratteri gave the police indeed was similar, though it contained more details than her trial testimony. During her interview, she described the shooter as a "pretty light brown skinned" male who was "maybe like five-eight, 160-150 [*sic*], like not big." She told detectives the suspect was wearing "black shoes, black t-shirt, blue jeans," and had longer black hair that was "kind of big." She also told them she did not notice any facial hair on the suspect and thought he was in his early or mid-thirties. A photograph of defendant taken the day after the shooting depicted him as a bald man with a beard and mustache.

At the hearing on his motion for new trial, defendant asked trial counsel numerous questions about his preparation and examination of Gratteri. Counsel testified that he reviewed the police reports and statements Gratteri made. He concluded from them that she was an "important witness" and, although he did not personally meet with her, he made sure his investigator located and interviewed Gratteri. Counsel testified that he also reviewed photos of defendant's truck, and acknowledged that Gratteri "gave a description of the vehicle . . . that was somewhat at odds with your vehicle." Nonetheless, he did not believe Gratteri's description of the truck was significantly different from that of other witnesses. Counsel also explained that "going down that path was not as important to me, because I think that based upon the totality of the evidence, the truck with the racing stripes was present at all three shootings, and that wasn't the focus of my defense of you. My focus is that you didn't do it." He further stated, "There were a few witnesses, . . . the two kids and other people that were going to identify your truck and/or you as being there. And since my theory of the case was that you didn't do it, and if we had gotten to it that you weren't driving the truck that day, I did not go into the tailgate. It was a matter of, you know, choice of defense."

Counsel testified that "throwing undue attention" to the truck was "not a good use of the time," in part because "there was some information that I felt could come out that would not have been in your best interest." Counsel also noted that Gratteri "didn't want to be here and was a little upset." Counsel further stated that he was concerned about damaging his own credibility with the jury, "since everybody saw the truck there" and he believed "it was more plausible" that someone else was driving defendant's truck,

"especially since Ms. Gratteri did not identify you and her description of the person was substantially shorter than you." Counsel reiterated that he thought Gratteri's description of the shooter was the most important information to elicit, though he did not offer an explanation for not highlighting the discrepancies between Gratteri's description of the shooter and defendant's appearance, or for not eliciting testimony about her failure to identify defendant in a photo array.

Defendant argues that counsel "attempted to justify his omissions with changing and conflicting testimony." We are not persuaded. The varied explanations counsel offered for declining to ask Gratteri about the truck dovetail with one another and suggest that several rational tactical considerations underlay his actions. It appears that counsel sought to minimize Gratteri's time on the stand and did not want to undermine her credibility or his own by eliciting testimony contrary to that offered by virtually every other witness or harmful to the overarching theory of the case. Whether to call a witness and which questions to ask him or her are tactical decisions to which we afford great deference. (See *People v. Mitcham* (1992) 1 Cal.4th 1027, 1049 [whether to call]; cf. *People v. Cleveland* (2004) 32 Cal.4th 704, 747-748 [extent of cross-examination].) Counsel's approach to questioning Gratteri was well within the wide range of valid trial strategy and reasonable professional assistance.

Defendant also claims that counsel was "entirely unfamiliar with Ms. Gratteri and the extent of her value" to his case, because counsel commented at trial that he had not seen the videotape of her interview. Specifically, counsel stated at sidebar, "Also, I see counsel has put what appears to be a video - - I believe that might be Ms. Gratteri, but I'm not sure - - on the video. And I've never seen this individual nor a transcript or any records of a videotaped statement of Miss Gratteri if that's in fact what it is." Counsel acknowledged he made these comments at trial, but testified at the hearing that he reviewed all transcripts and interviews related to Ms. Gratteri. Defense counsel explained at the hearing that he ordinarily did not interview witnesses personally to minimize the risk of becoming a witness himself, which explains his apparent unfamiliarity with Gratteri's appearance on the videotape. While it may be ideal for an

attorney to review both a transcript and a videotape of a witness interview he or she did not conduct, nothing in the record suggests that the transcript was incomplete or inaccurate. Counsel's reliance on the transcript in this case did not render his investigation or preparation deficient. Counsel was sufficiently familiar with Gratteri's interview and its contents to recognize her value as a witness, subpoena her, and prepare appropriate questions. His erroneous comment that Gratteri, who rendered medical aid to Gonzalez, was a nurse does not compel the opposite conclusion. The jury was instructed that the statements of counsel are not evidence, and we presume the jury understood and followed that instruction. (*People v. Wilson* (2008) 44 Cal.4th 758, 804.)

Defendant also points out that counsel testified that he could not recall whether he questioned Gratteri about the truck, why he did not ask about the truck, and at one point stated that not asking her about the truck "might have been an oversight." These minor inconsistencies, which occurred early in counsel's testimony, do not invalidate the more robust tactical explanations he consistently provided throughout the remainder of the hearing. The hearing occurred roughly a year after counsel was fired and lost access to his notes and trial materials, and counsel was in the midst of a different trial at the time. Imperfect recollection under such conditions does not imply deficient performance.

### b. Celena Evidence

At the hearing, counsel explained that he called Celena as a witness at defendant's urging, and against his professional judgment. As defendant acknowledges in his brief, "she was uncooperative." Namely, she offered conflicting testimony about where she was when she heard the fatal gunshots at Toland Way. In one version, she said she was in the house, and, in another, that she was halfway down the driveway. Defendant argues that counsel was deficient because he did not properly impeach Celena with statements she made to the police. In one of those statements, Celena told police that she went downstairs to call Carlos for dinner at around 5:30 p.m. Her children met her. When she was halfway to the front yard, she heard three shots from that area. She then ran to front yard and saw Carlos lying there. A second police report indicates that Celena told detectives that she met her children halfway between the apartment and the street, at

22

which point she heard several gunshots. She and the children ran to the apartment and entered. Celena then left the apartment and ran to the front yard. Notes from a third police interview indicate that Celena heard gunshots while she was in the house. A child ran to her and told her someone shot dad. Celena then went outside and saw Carlos on the grass. Impeaching Celena with her statements to police was important, defendant argues, because it would have undermined her daughter Ariana's credibility by establishing that Ariana was "not in a position in which [she] could see either the shooter or the vehicle in which the shooter came and left."

Defendant concedes, however, that "defense counsel clearly understood the significance of Ariana's testimony and her ability to observe what she claimed to have." He also points out several inconsistencies counsel elicited from Ariana during cross-examination. It is unclear from the record what additional impeachment of Celena would have added to these efforts. Celena changed her testimony without any prompting from counsel. Nothing in Celena's statements to police definitively placed Ariana in any particular location, or in a location from which she would have been physically unable to observe defendant shoot her father and flee the scene in his truck.

Counsel personally visited the Toland Way apartments to examine the scene and assess witness vantage points. He cross-examined Ariana about what she saw. He also called an expert on memory and identification to call into question the reliability of all of the prosecution's eyewitnesses, particularly the youthful ones like Ariana, whom the expert opined were most susceptible to suggestibility. Counsel's failure to properly impeach Celena with her statements to police did not render his performance deficient. (See *People v. Frierson* (1979) 25 Cal.3d 142, 158.) Moreover, even if it did, counsel testified that he called Celena to the stand at defendant's insistence, a claim defendant did not refute. "The invited-error doctrine operates, in particular, to estop a defendant from claiming ineffective assistance of counsel based on counsel's acts or omissions in conformance with the defendant's own request." (*People v. Lang* (1989) 49 Cal.3d 991, 1032, abrogated on other grounds by *People v. Diaz* (2015) 60 Cal.4th 1176, 1190.)

23

### c. Racial Background Evidence

At trial, defense gang expert Estevane testified that the Mexican Mafia and other Latino gangs "do not want Blacks within their gangs," "they have shot and killed Blacks on sight," and "it would be highly unlikely that there would be a benefit of a Black man to do Mexican Mafia business." Counsel did not elicit any testimony or introduce other evidence that defendant was Black. Percipient witnesses variously described the shooter or truck driver they saw as olive-skinned, brown-skinned, light-skinned, non-white, Caucasian, Hispanic, Latino, "Latin in nature," and Mexican American. No witness described the shooter or truck driver as Black or African-American.

Defendant argues that the defense theory was that he could not have worked with the Mexican Mafia because he is Black. Thus, his African-American heritage was "a crucial fact he needed to establish to defend against the gang allegations," and counsel performed deficiently by failing to introduce explicit evidence of his racial background. Despite counsel's failure to elicit testimony about defendant's precise racial background, the jury had before it sufficient evidence to reach a conclusion about his race. Defendant was sitting in full view of the jury throughout the duration of the trial. A jury's observation of defendant's appearance is non-testimonial evidence. (See *People v. Montalvo* (1971) 4 Cal.3d 328, 335; Evid. Code, § 140.) It is "routine" for a jury to assess the defendant's physical appearance to see if it comports with a physical description given by a witness or to determine if his or her appearance supports a factual finding that must be made by the trier of fact. (*People v. Garcia* (1984) 160 Cal.App.3d 82, 91 fn. 7.) Indeed, counsel argued that very point to the jury: "you've had the opportunity to view him. You don't take leave of your senses when you come sit on the jury." Defendant's assertion that it "was not clear from his appearance that [he] was African-American" does not render counsel's reliance on his presence in court to establish his race objectively unreasonable, particularly where counsel retained a gang expert who testified about numerous other ways in which the shootings diverged from typical Mexican Mafia practices.

## 2.    Prejudice

Even if counsel performed deficiently in one or more of the ways defendant alleges, the record does not support the conclusion that there is a reasonable probability the outcome of the trial would have been different absent the alleged errors.

The omitted Gratteri and Celena evidence was pertinent only to one of the three March 1, 2009 incidents, the Gonzalez murder. The evidence connecting defendant to that incident was very strong. Nazareno testified that she saw a man talking to Gonzalez whose jaw line, skin tone, and general appearance looked very similar to defendant, and later saw that same man standing near Gonzalez holding a gun. Nazareno also saw the shooter drive away in a black truck with racing stripes. Ariana, who knew defendant, testified that she saw him shoot her father and drive away in his black truck with racing stripes. Both Nazareno and Ariana testified that the perpetrator had a black beanie on his head, which the jury readily could have squared with the omitted Gratteri testimony that the shooter had black hair. Aguilar testified that he saw a man wearing a black beanie drive a black truck with racing stripes away from the direction of the gunshots and through several stop signs. Defense witnesses Danielle and Celena both testified that defendant was at the scene near the time of the murder, and defendant himself testified that he was at the Toland Way apartment building mere minutes before the shooting occurred. Defendant also made several incriminating statements during a jail call about an incident that took place in front of children on a driveway. The addition of Gratteri's observations about the truck and shooter's hairstyle or impeachment of Celena to this ample evidence of defendant's guilt would not undermine our confidence in the jury's verdict. (*Strickland*, *supra*, 466 U.S. at p. 694.)

The evidence connecting defendant to the Mexican Mafia, and therefore the gang allegations, was also very strong. Two gang experts, Villasenor and Castanedo, both opined that defendant was affiliated with the Mexican Mafia and committed the shootings for the benefit of that organization. Other evidence showed that defendant was connected to numerous members and affiliates of the Mexican Mafia through his relationship with Cordero, regardless of his racial background. Defendant mentioned some of those

25

individuals during tape-recorded phone calls and made other comments suggesting he was concerned with Mexican Mafia business and policies during his incarceration. There was evidence showing that Gonzalez had fallen out of favor with the Mexican Mafia, that Zamarripa was his right-hand man, and that a green light against an individual could extend to others closely associated with him or her. There is no reasonable probability that testimony regarding defendant's race would have led the jury to discount all of this evidence and find the gang allegations untrue.

## II.    Parole Revocation Restitution Fine

The trial court imposed and suspended a $10,000 parole revocation restitution fine pursuant to section 1202.45. Section 1202.45, subdivision (a) requires the trial court to impose a parole revocation restitution fine "[i]n every case where a person is convicted of a crime and his or her sentence includes a period of parole." The parties agree that defendant's sentence did not include a qualifying period of parole and therefore did not subject him to the fine mandated by section 1202.45. (*People v. Oganesyan* (1999) 70 Cal.App.4th 1178, 1185-1186; *People v. Brasure* (2008) 42 Cal.4th 1037, 1075.) We accordingly strike the $10,000 fine.

## DISPOSITION

The $10,000 parole revocation restitution fine is stricken. The judgment is affirmed in all other respects. The clerk of the superior court is directed upon issuance of the remittitur to prepare a corrected abstract of judgment omitting the parole revocation restitution fine, and to forward it to the Department of Corrections and Rehabilitation.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.

We concur:


WILLHITE, Acting P. J.                                        MANELLA, J.

26